First argued case is U.S. v. Mincoff. When you're ready, we've read your brief, we look forward to your argument. May it please the court, Jeremy Warren of Warren and Burstein on behalf of the appellate teams, Mincoff. This is a Brady case. In this case, the government held back a report containing what was very explosive impeachment material related to really the government's main witness, as this court found in its opinion affirming the conviction. The fact that he'd been involved in a perjury scheme, that not only was he involved in it, but he instigated it. And this report was never turned over to the defense, nor was the material contained in the report. And I – Well, maybe you're looking at a different case than I am, but I thought that in this case, that the material from the agent was wholly duplicative of what you'd already received. You received a complete copy of the transcript and the actual recording. You received copies of other information from the FBI. Basically, everything that was there, this was no more than a repetition. How is this so explosive? Thank you, Your Honor. And I'll start out by saying that the court, Your Honor, is mostly correct. And what I mean by that is that it's absolutely true that as was the obligation of the government and it turned over the recordings themselves. It turned over the line sheets, not actual transcripts, but agents' notes, which frankly with these phone calls were fairly accurate with regard to the contents of the calls. And also, as the government found out by the time they filed their reply brief or their answering brief, there was a wiretap application that commented on this. First of all, there were over 30,000 phone calls, 31,000 line sheets, and so forth and so on. And so it was very difficult for the defense lawyer to have found it during looking just at that. This is just a follow-on to help answer Judge Smith's question. When you say found it, what do we mean by it? What's the information that you say wasn't handed over in a way that you could use it? Right. And this is, I think, the precise issue here that is the distinction between what was in sort of the raw information that was turned over and what was contained in the 302 that was never turned over. The difference is this. The phone calls had some, created a suspicion. There certainly was an implication that Munoz, the cooperator, had started this perjury scheme. He says, have little Ricky step up and take the fall. But it was vague. It could have been, have little Ricky step up because he's guilty, because he did it and he needs to take responsibility. It also certainly could have been, as the government alleges, and we now know is the truth, that it was a fabrication. What's different is that in December 2005, the government had, in essence, flipped Munoz, who had heretofore been a target of the investigation. They sat down with him. They interviewed him. And he admitted involvement. When you look at the 302, it says, Ricky did good, did the right thing. That was in the letter that Durkin had written to Munoz. And then it says, according to Munoz, this is a reference to Ricky Contreras, who testified falsely at the preliminary hearing that the meth belonged to him and not Durkin. And then there's a parenthetical after that that says, hey, we know from intercepted conversations that this is this perjury scheme. The parenthetical is critical because that's what agents do, is they put in parentheses their interpretations and comments. In the wiretap application, it's replete with that. So-and-so said he needed three. And then they put in parentheses kilograms of cocaine because that's their interpretation. Why isn't the parenthetical that's added to the wiretap affidavit, this is ER-93, it looks like. To me, that just discloses everything that defense counsel would have needed to know. No, it-respectfully, Your Honor, it-you're talking about the wiretap application? The forced Contreras to take the blame for the drugs. That's what the agent adds. That's in the wiretap application. That is their suspicion. At that point, they have not debriefed Munoz. They're listening to the raw phone calls. But the application gives you day and time of the specific phone calls that defense counsel could go and listen to and to figure out, oh, this is what's going on. First of all, we don't think that the defense counsel ever did that, and that's an IAC thing that we- I mean, that's your better argument. I think you have problems there as well. But to me, that's what's going on here. Defense counsel just missed this obvious reference to the very thing that you say would have made a difference. Well, except that-and forgive me, I'm not articulating it very well. What's different about the phone calls, which create a suspicion. I mean, there's a belief. That's an agent's interpretation. We think. We think that there's a perjury scheme being instigated. They were right. But it was-they had no way to know for sure at that time. It was just a belief. Where it becomes- But, counsel, with respect, I think all of us are kind of referring to the same thing. The Witkowski report that you're talking about, in its totality, as I understand it, said, intercepted conversations indicated that Durkin and Jesse Munoz solicited the false-slash-perjured testimony of Rick Contreras on behalf of Durkin. And that's at CR 115 through 117. Now, as I understand it, under Cunningham, there's no obligation on the part of the government to ferret through all this information and point out to you how you might use it in a particular way, is there? No, but what's different is, during the debrief, in the 302, we're not complaining just about the failure to turn over the 302 containing this information. It's what the 302 represents. It's the tip of an iceberg. We know that Durkin-pardon me-Munoz is being debriefed by the government. We know they're asking him to write letters to Durkin about what's going on in his case. We know that they're discussing, and that based on this report, that Munoz is admitting to the government that he did this. And all that information you had, that was all given to you? No, because before-forgive me, Your Honor, respectfully-up until the point where Munoz admits it, it's just an allegation. It's just a suspicion on the part of the government. Now, there may have been-we can debate over how ample that evidence was to convince a lawyer that there was this scheme going on. It was the proof of the perjury scheme that makes the 302 in the government's debrief of Munoz different. Now, when you say the perjury scheme, are you referring to anything more than wanting-step up, Contreras takes the blame for the drugs. Is there anything more of what you're referring to as the perjury scheme than that Contreras says they were mine? Right, and Contreras did. He went and testified at the preliminary hearing. My question is, is there anything more to what you are calling the perjury scheme than this? No, it's about Munoz and Durkin having repeated phone calls and who knows what else to set up this false testimony that- Contreras says the drugs were mine. Right. But there's nothing else in terms of a perjury scheme. It's only that statement by Contreras, those drugs were mine. Right.  If that's true, maybe you could address materiality, which is the same issue for prejudice under your IAC claim. I guess I'm having a hard time seeing why this additional little nugget, which no doubt a competent defense counsel would have used to cross-examine Munoz on further. But how did that add enough to what, to the impeachment that was already put in place for a jury? So we know from Coring and other cases that it doesn't matter that there has been other impeachment on other avenues if there's a new dimension. And perjury and subordination of perjury, which happened in the Coring case, in that case they called it an entirely new dimension, a new avenue. It's never cumulative. So I agree that he was impeached with the fact that he participated in some crimes and that he pled guilty and that he was facing a lot of time and was hoping for leniency at sentencing. But the jury never heard about it, whether it was because the government didn't turn it over or the defense counsel missed the boat. Let me be a little bit more focused. Munoz, he's not talking about himself having committed perjury. He's just talking about getting this other guy to try to get someone to help him out in this other guy's case. Well, sure, but he instigated it. I mean, he started it and he repeatedly called in phone calls, kept pushing Durkin to see what's going on, let's get little Ricky to do this. He didn't perjure himself with regard to the Durkin state court drug case, but he was a participant in the conspiracy. I mean, if he had been charged, he clearly was guilty of a conspiracy to commit perjury and obstruct justice. The other thing that I guess I'm having trouble with is that it seems to me, sure, the government needed Munoz's testimony to get the conviction, but in some ways your client had admitted the most damaging part of these reported calls, which was that, yeah, we were talking about drugs. Well, this was, in my opinion, goes to the heart of the problem with the failure to impeach him with the devastating evidence of being involved in suborning perjury, because all the other impeachment goes to, you know, everyone has a motivation to lie. It's very routine that cooperating defendants have a motivation. They want less time, and they've committed crimes. They're co-defendants in the case. Very rarely, and it's pretty extreme to see a case where someone has admitted perjury. You look at the Coring case, and, again, they reverse it. It was very similar. The witness in that case, Alan, was interpreting phone calls and meetings and videotaped meetings with Coring. There was a lot of impeachment on him for the typical motivation to provide false testimony, but they called the perjury scheme that he had tried to get girls not to testify about sexual misconduct with him as tipping the scale, and in this case, it's the same thing. I think if the lawyer, if a competent lawyer had been aware of the perjury scheme, this would have been an additional piece of evidence that arguably would have destroyed any credibility of Munoz, and the defense would have changed. It would no longer have been, I concede. Remember, he didn't testify, Minkoff, in the trial. This was just a concession his lawyer made. Yeah, these are drug deals. He gave the government about 85% of what they needed because the defense was, you know, not a buyer-seller and not a conspiracy. It seemed like an odd defense. I'm sorry to cut you off. No, please. Because on the tapes themselves, your client is referring to this third party that he's trying to acquire the drugs from. Exactly, and so it was a very weak, in my opinion, it was a very weak defense, and Munoz killed it by talking about fronting drugs in the previous episode, which he was the only evidence of. But even in the testimony, even in the tape with Minkoff, he refers to a prior deal. Right, exactly. We've already got that from his own words with the tape that Minkoff himself participated in. Right, but you can still be a buyer and seller and not be a conspiracy. But the add-on, I mean, it's a very subtle defense to say, well, I was only guilty of buying drugs. I wasn't in it with him. So as a conspiracist, so that we were cooperating together. Your Honor, I would just point to a case I think that Your Honor actually wrote the opinion on called Aguilar v. Woodford. It was a state court habeas case that came out last year and involved a dog that. Riley. A dog named Riley. I know the case well. Okay, and so the evidence in that trial, correct me, please, Your Honor, but that the dog had sniffed that this guy, the defendant had been inside a Volkswagen van that placed him at the scene of the crime. His lawyer conceded in closing argument, well, I guess my guy was in there, which was terrible evidence. It turned out what was suppressed was the fact that Riley was an unreliable dog, and actually his evidence had been suppressed and not excluded from other trials. The court wrote, the strength of the unimpeached dog scent evidence forced Aguilar's counsel to make a strategic concession in his closing argument. Had the dog scent evidence been excluded, counsel would never have made that concession. And so I think this goes to whether it's Brady or IAC, that had the lawyer really thought this through and become aware, really gone through the evidence and become aware of this perjury scheme, would have simply gone with a reasonable doubt argument of there's no drug deal here. All they're talking about are numbers, 15, 3, 1, 6, 5. It could be about anything. And from trying these kind of cases, jury's really bent over backward to try to come up with any other reason. We as people practicing in court all the time, we kind of concede through some of these calls, but jurors don't. And by conceding it, he really just threw in the towel in a lot of ways. Are you saying, counsel, that your best argument is your IAC argument and you're kind of abandoning the Brady argument, is that what you're doing? I'm responding to the court's concerns. No, I understand. You're talking about the case going to the dogs. But my question is whether you're now saying we should look primarily at the IAC issue as opposed to the Brady issue. I think in some ways it's stronger because, as the government points out, this evidence was turned over in several different ways. Again, I think it's a significant distinction that it wasn't the proof, the admission, that was never turned over. But there are a lot of problems with the trial counsel. This is the case where the trial counsel was fined, as the government pointed out in its brief, fined $10,000 for some misrepresentations to the court. This is a gentleman who got 20 years in prison for a drug deal that didn't happen, although there were discussions about a previous one. It was a very serious case. The standard, I know, doesn't change based on whether it's a misdemeanor, a felony, or the sentence, but it was a very short trial. We're asking for it to be done, not perfectly, but to be done fairly, done right, and that didn't happen in this case. I just want to understand what's in front of us now. I see it's not in front of us at this point. That's for later. That's for 2255. Well, the certificate of appealability, if I understand the question, Your Honor, the certificate of appealability granted, we requested both. Okay. The certificate just granted the one. I didn't know that I could brief an uncertified issue, and then after the government replied, showed that there had been another way that the evidence had been turned over, I asked the court and filed a motion to allow us to reopen. The court granted that, and the government replied. Gotcha. Now, let me ask it this way. Ordinarily, of course, IAC is raised either 2254 or 2255. Oh, it was before the district court, Your Honor. I understand that. Ordinarily, we don't deal with IAC on direct appeal. Is there anything that could come in on a 2255 that would help us decide IAC that is not now in the record? Your Honor, this is a 2255. Oh, I'm sorry. This is a 2255. And I would point, and I know I'm running out of time. I'd like to reserve it. I missed this one. May I just say this? There's a declaration from McCabe, the trial counsel, where he lays out that he went through and never found this stuff. And also pointing out that his trial strategy was based on impeachment. And so that was his whole goal. That was his job in this case, and he missed it. Whether it was for whatever reason, it didn't happen. And I think it goes to the heart of the question is really the materiality. It's the same standard. But if I might save a minute or two for it. We've taken you over, but we will give you a chance to respond. Good morning. May it please the Court. David Leshner for the United States. Defendant Minkoff received a fair trial in the district court, and the jury's guilty verdict is worthy of this Court's confidence. As Your Honor noted, the standard for Strickland prejudice and Brady materiality is the same. There was no suppression in this case. The government in this case did what this Court would expect, and it turned over the evidence of Munoz's suggestion that Thomas Durkin have Ricky Contreras step up and claim responsibility for the drugs. Why didn't you hand over the report? Your Honor, the report was not turned over because it was not subject to production under Rule 16.A.2. It was not janks, as this Court found in affirming Defendant Minkoff's conviction on direct appeal. And it laid out the fact that Jesse Munoz was cooperating. The government determined that the information to which the defense was entitled had been produced, not just in the calls, but in the line sheets themselves, which were a summary and almost a verbatim translation or transcription of the calls, as well as the wiretap affidavit. And the government had very real concerns for Jesse Munoz's safety in this case. But you produced it later. We produced it later, that is true. Had those concerns for his safety dissipated? At that point, Jesse Munoz, yes and no, and I can explain why I answer your question that way, sir. Yes, to the extent that Jesse Munoz had relocated. But it didn't matter because the government anticipated calling Agent Bitkoski to testify regarding that incident, and cognizant of our obligations under the Janks Act, we produced the report. We also complied with our obligations under Brady and Giglio by producing the information, the underlying information that is identical and, in fact, far more detailed than the one-sentence reference in the report. So we did comply with our obligations under Brady and Giglio, Your Honor, and we did so understanding that the report itself added nothing new. Well, you see, I'm not sure that the report added nothing. I think the report would have made it more obvious what the problem was with your witness Munoz, and my guess is it was a strategic withholding and was not strongly based, if at all, on safety of Munoz, given that you hand it over at a time when Munoz is still vulnerable. This may or may not be a Brady violation, but it does strike me that you're not handing over things that are potentially exculpatory, maybe, although I don't know for sure and I don't expect you to admit it, kind of hoping that the defense counsel would miss it, which he did. Well, let me respond to that as clearly as I can. The report just slaps him across the face with a dead fish. If he has that report in his hand, he can't miss it. Well, if that were the case, Your Honor, then the affidavit would have slapped one across the face with a dead fish as well, because the affidavit, which spells it out plain as day that Jesse Munoz suggested that Ricky Contreras step up, and as Your Honor pointed out, it lays out the date of the call and it summarizes the call. There was no plucking out of this report and hoping the defense would not find it. It cannot be squared with the government putting that information in the wiretap affidavit at SCR 92 and 93 and producing it to the defense. This wasn't just one report that was plucked out. The government made the determined and considered decision that 302s, which were not Jenks and not subject to production under 16A2, were not produced. There was no withholding of information with the hope that the defense wouldn't find it. We didn't do that in this case. We complied with our obligations and I would respectfully, yet vigorously, disagree with any suggestion that we were playing fast and loose here. And I think the record as a whole demonstrates otherwise, Your Honor. When Jesse Munoz, in preparing for trial, had a changed recollection as to the 2004 transaction, that it wasn't, in fact, 8 kilograms of cocaine that he obtained from Minkoff, but it was 5 kilograms of cocaine, the government immediately put that information out to the defense in a letter, and that is at SCR 114. And the defense used that information to cross-examine Jesse Munoz. And I think that's important, Your Honor, because it shows that we did, in this case, take our grading and dignity obligations very seriously. Why not send a letter saying, oh, by the way, Munoz has admitted what's alleged in the affidavit? The reason why the letter was sent with respect to Munoz's changed recollection regarding the 2004 transaction was because it wasn't available anywhere else. The defense would have had no way of knowing that absent a letter. Well, his admission, as I understand it, what the 302 adds is that you don't need to put two and two together. The guy has actually admitted, yeah, we did this. What the 302 says is that Munoz agreed that Ricky was Ricky Contreras. I mean, we've got – and there wasn't an extended discussion of this because the agents knew what had happened based on the intercepted calls already. I mean, this is one, you know, small part of an otherwise far-ranging interview covering this entire letter from Durkin to Munoz. But the reason why there was no separate letter is because the information was already out there. It was already out there three different ways. And where the new information was received that was not available to the defense, that was turned over right away in a letter, and it was used at trial. I mean, the fact is – I'm now referring to a separate case. Are you familiar with the missing luggage case? I read a number of this Court's Brady cases, but – The missing luggage case on Bonk where – Yes, I do know what you're talking about now, yes. Where we are watching your office. Well, I understand, and I know the case that you're talking about. I understand that it comes from my office. And I would say this. I can't speak. You're supposed to turn square corners when you're dealing with the government. The government is also supposed to turn square corners. And sometimes maybe you want to give every advantage to the defense in the sense of another little tidbit that's in the report that's actually helpful. Maybe it's not material. Maybe you can get by on this one. But it does seem to me that handing over this report would have been helpful to the defense. But do you think it would not have been helpful to the defense in any respect? Well, in hindsight, because, as Mr. Warren agrees, it looks like defense counsel missed it. And it looks like – But even – let's assume now, counter-hypothetical. Okay. Let's assume the defense counsel didn't miss it. I mean, they did pick up what's in that affidavit for the wiretap. They did then consult. They read the transcript. So they picked it up. Is there anything in the report that would have helped them in addition to that? I don't believe so. To the extent I understand, Your Honor, you said the defense did pick it up. I'm assuming – this is a counter-hypothetical. Assuming that they did, would this report have helped them in any respect? I don't believe so, Your Honor. You have a defense counsel who – and I would appreciate a chance to address materiality, which I understand is of concern to the court and certainly to us as well. There was no additional information in that report. SCR 20-22 show Jesse Munoz saying, hey, you should talk to Ricky. Tell him to suck it up and say it was his. And as the district court found, those calls, specifically that call and the transcription of it, clearly indicated Munoz's suggestion that Durkin contact Ricky to tell him to falsely claim responsibility for the drugs. That's what would have been the cross-examination. You did this, didn't you? Yes, I did. The report, the additional parenthetical in the report, would have added nothing. I guess to take your hypothetical one step further, if on cross-examination Jesse Munoz had denied it – I never said that. I didn't do that. Now, he would have been assailed with evidence of the recording, I imagine. And the government certainly would have had the obligation, knowing what it knew, not to allow a witness to give perjured testimony. And we would have walked up to the defense counsel, as we do in the middle of a cross-examination, and tell him, hey, he told us something different before. Well, can I just suggest that it's not going to affect you in this case. But there was another option, and you could have submitted the 302 to the district court in camera, explained what you had already disclosed, explained the reasons why you were withholding the 302, and let the district court make the call. And instead, we're sitting here, you know, you're having to try to defend the judgment call you guys made. Put it on the district court. I don't understand why you've even allowed this conviction to be in any way in jeopardy by making this. It's a close judgment call. It could go either way. Why do that? I understand your point, Your Honor. And there are cases in which we decide if there's a doubt that, yes, we go to the district court. As you say, I guess. You should have. You should have here. It's a close call. Why? I just don't understand why prosecutors' offices don't, when you know, boy, this probably could help, but we think we've given them enough to allow them to make an effective cross-examination. We're going to keep this back. Bring the district court in. That was an option open to you. I just don't understand why you didn't take advantage of it. And I would simply say, Your Honor, it's because we believe that, as we do now, that all of the information was out there for the defense to take advantage of, and that they said it. I disagree with anything you're saying, Your Honor. I understand it. Let me ask specifically, is there anything from the government's perspective, if I'm saying it correctly, report that was not already in the hands of the defense counsel, maybe in multiple ways? Is there anything that's in his report that is not elsewhere available to the counsel? I would say no, Your Honor. Okay. So if that's true, and I don't quarrel with what my colleagues suggested in the future, is it the government's position that, in this case, even though you perhaps could have done a different trial approach, the defense could have done something different, the reality is that the law, as far as Brady is concerned, was fully complied with. Is that your position? It is our position that we fully complied with our obligations under Brady, that there was no suppression in this case, and that even if there had been, the evidence was not material for the same reasons there is no prejudice under Strickland v. Washington. And with the Court's permission, I would like to address that. The evidence in this case was overwhelming, and the critical evidence was the recorded phone calls, which clearly documented, step by step, defendant Minkoff's efforts to obtain cocaine from Munoz for Minkoff's guy, for his buyers. Those calls were clearly inculpatory, and they are important, I think, for three reasons. First, they laid it out to the jury exactly what Minkoff was trying to do. But help me on this one. The defense was not that he wasn't buying drugs. The defense was, I was only buying drugs, and this was not a conspiracy between me and the seller. Exactly, and presumably the defense... He says, listen, I'm buying it to give to my guys. That doesn't show a conspiracy. That just shows he's buying drugs to distribute, of course. It's illegal. But he's saying this wasn't a conspiracy. Right. And the defense presumably was that because the calls were so directly inculpatory. There was nothing ambiguous about these phone calls. You're right, that merely buying and selling drugs does not establish a conspiracy to distribute. And that was the defense. It was the buyer-seller defense, and that was fleshed out before the jury. There was a jury instruction given. But in order to turn it into a conspiracy, you, the government, had to show that somehow Munoz and Minkoff were in this together, not just as a buyer and seller, but that somehow it was a scheme that was jointly profiting them. For example, maybe fronting the drugs, and he gets a percentage when it comes back. I mean, more than just buyer-seller. That's correct. Which is why the evidence you just outlined doesn't go to this conspiracy. So what evidence do you have that went to the conspiracy? Well, I would respectfully disagree with that it doesn't go to the conspiracy. Minkoff's repeated references to my guys, and my guy sitting right here, he's got the paperwork, the money for three kilograms of cocaine. He's ready to roll. Make it very clear to the jury that the purpose of this transaction was not merely for Munoz to sell drugs to Minkoff. It was for Munoz to acquire drugs from his source of supply to provide them to Minkoff so that Minkoff could distribute them further to his buyer. And that was the critical part of the arrangement. The evidence did show that there was going to be fronting. There was fronting in 2004, and as this court noted in its opinion affirming the conviction, there was evidence of fronting in 2005 as well. In one of the reported calls, Minkoff said, Hey, run them down to me, meaning bring me the drugs so I have to go back and forth to get the drugs and bring them to my buyer and get the money and bring it back to you. So there was in fact evidence of fronting that would establish a distribution conspiracy based on the calls. And because of the critical nature of the fact that it's Minkoff's buyer that is driving this entire transaction, it is the government's position, I believe the evidence supports it, that there absolutely was more than a mere buyer-seller relationship. And those calls were directly, well, those calls fatally undermined the defense. And I would say, Your Honor, that those calls were important for a third reason, and that is that they corroborated Jesse Munoz's testimony. Detective McCoskey testified as to the first call. He interpreted some of the terms. Jesse Munoz's testimony, as you'll see from the record before you, he introduced the remaining telephone calls through him. And those calls documented it step by step. And finally, I would say this. When the government, in closing argument, told the jury, the critical evidence in this case comes directly from Minkoff. It is the calls. And in closing argument, the government told the jury, Jesse Munoz, who had admitted to a host of crimes, including a murder, you should absolutely view his testimony for scrutiny. And when you judge his credibility, you judge it. Look to see whether his testimony is consistent with these undisputed calls. And it absolutely was. Thank you. Thank you. We took you over, but why don't we give you two minutes to respond. First, with regard to the government's argument that the 302 is not discoverable under Rule 16.A.2, that's relying on a case called Fort. But Fort specifically says that it only deals with inculpatory evidence, not exculpatory evidence. Otherwise, the government could take all Brady material and just stick it into 302s and call it government work product and not turn it over. So that's not an excuse for not turning it over. Emphasize again that the report, and your Honor touched on it, the report's different. It provides the proof of the conspiracy to commit perjury. Everything else was just suspicions. We as Trump – I'm having a little trouble with that proposition because of the clarity of the statement in the affidavit. That pretty much says to me, he says, listen, I told Contreras he should suck it up and lie. The affidavit is just an agent's interpretation of the phone call, and it's not proof. It's just an allegation. It's like an indictment saying so-and-so and – I mean, that's Vitovsky's conclusion. It's just Vitovsky's conclusion that he lied. Right. Well, it's – right. It's the case agent's conclusion, but, you know, as trial lawyers, we learn, don't ask a question you don't know the answer to. The fact that the guy admitted it – the government wants to downplay it now, but the fact that he admitted it during debriefs – and we don't know the extent of the conversations. That's never been revealed. All we have is this 302 that gives us a little tunnel hole into what may have happened during those debriefs. The fact that he admitted it gave the proof, and it provided yet another area of impeachment that did not happen in this case, which is the benefits that were expected by Munoz the informant. Because if we had known, if the trial lawyer had known about this, the cross-examination would have also included you talked about this with the government. You admitted that you did – that you committed perjury. Did they make you – did they charge you with it? Did they make you plead guilty to it? In your long factual basis for your plea agreement, did they include the fact that you committed conspiracy to perjury? Did they make you need a plus two under the federal sentencing guidelines for obstruction of justice with regard to the investigation of this case? No, no, no, no, no, no, no. These are critical things. Now, the government – Okay, you've used your two minutes if you want to sum up. Okay. Just in terms of materiality, the phone calls had to be interpreted by Munoz. He was more than 50 percent of the trial. The Ninth Circuit opinion affirming heavily relied on Munoz's testimony to defeat the buyer-seller defense. His testimony, the fronting, was heavily relied upon even in oral argument. So these are things where his testimony was critical, and for that reason we do think it's material to ask the court to reverse. Okay. Thank you. Thank both sides for your arguments. The United States v. Minkoff, submitted for decision.
judges: Fletcher, Smith, Watford